1

2

3

4

5

6

7

8                              UNITED STATES DISTRICT COURT

9                         FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   ELISELO ARELLANO, a.k.a. ELICEO          No.  2:11-cv-03375 WBS AC
     ARELLANO-NUNEZ,
12
                    Petitioner,
13                                             FINDINGS AND RECOMMENDATIONS
            v.
14
     C.D.C.R.,
15
                    Respondent.
16

17

18          Petitioner is a state prisoner proceeding pro se with an application for a writ of habeas

19   corpus pursuant to 28 U.S.C. § 2254.  The petition, ECF No. 1, presents four claims challenging

20   petitioner's 2007 convictions for carjacking, attempted murder, and related offenses.  Respondent

21   has answered.  ECF No. 14.  Petitioner did not file a traverse and the time for doing so has

22   expired.

23                                        BACKGROUND

24          Petitioner was charged in a sixteen count information with offenses arising from two

25   distinct incidents: a carjacking in August of 2006 and a shooting in September of 2006.  The case

26   was bifurcated by incident and tried to two different juries in San Joaquin County Superior Court.

27   Petitioner was the sole defendant in the first trial regarding the September shooting.  Petitioner

28   was tried together with co-defendant Justin Canon in the subsequent trial regarding the August

                                                    1

1  carjacking.  Gang and gun enhancements were at issue in both trials.

2        Trial on the September 12, 2006 Incident

3        *Prosecution case*

4        The prosecution presented evidence of the following:

5        On September 12, 2006, Anthony Handy drove his cousin David Rangel to an apartment

6  building in Stockton to visit Rangel's fiancée.  Rangel got out of the car, approached petitioner

7  and Krystal Ellis in front of apartment 107, and asked for directions to apartment 106.  As Rangel

8  walked by petitioner, petitioner pulled out a handgun.  Rangel walked away and back to the car.

9  Rangel, who was a member of the Norteño gang, did not see any indications that petitioner was in

10  a rival gang.

11        Rangel got back into Handy's car.  As they drove away, Rangel heard gunfire.  The back

12  window of Handy's car shattered, and bullets struck Handy.  Handy suffered gunshot wounds to

13  the back of the neck, left ear (part of which was blown off), and back.  Handy was left with scar

14  tissue in his lung, shrapnel in his body, and a deformed ear.  Rangel was not injured.

15        The following day, an officer saw petitioner riding in a vehicle and initiated a traffic stop.

16  The car sped away, with the officer in pursuit.  A couple pulling out of a parking lot in another

17  car saw petitioner throw something out of his car window as he drove past them.  Petitioner

18  abandoned his car and fled on foot.  Eventually, officers apprehended him.  The couple in the

19  other car directed officers to the parking lot, where officers located a clear baggie full of bullets

20  and a loaded .357 handgun.

21        The preliminary hearing testimony of Krystal Ellis, petitioner's girlfriend, was read into

22  evidence.  Ellis lived in the apartment building at the time of the shooting.  On the day of the

23  shooting, she and petitioner were standing outside the apartment when Rangel approached them,

24  bumped into petitioner twice, and spoke rudely.  Ellis tried to "yank" petitioner into the

25  apartment, but petitioner resisted.  Ellis went inside alone.  She then heard gunshots and went

26  back out to see if petitioner had been hurt, but she could not find him.  Although Ellis did not hear

27  any gang-related statements, she knew petitioner was a Sureño.  The month before the shooting,

28  petitioner had visited Ellis and had a short-barreled handgun.  She did not see the gun again.

Detective Ridenour testified as an expert on Hispanic gangs.  Ridenour, an officer for 12 years, had spent two years as a member of the Stockton Police Department's Gang Violence Suppression Unit.  He had received special training in the area of criminal street gangs, and conducted such trainings.  As an investigator and intelligence officer for Hispanic gangs with the Gang Unit, Ridenour personally investigated gang-related incidents, interviewed gang members, and was familiar with local gangs and their territories.  His primary duties involved monitoring the activities of the Norteño and Sureño gangs in Stockton.  From photographs, Ridenour explained the relation of petitioner's tattoos to the Sureño gang.  The Sureños' primary activities include homicides, attempted homicides, carjackings, burglaries, possession of firearms, vandalism, and drug sales.  Ridenour had past contacts with petitioner related to Sureño activity. Petitioner had been documented by police as a gang member in 2003, and in Ridenour's opinion had been an active member since that time.  In Ridenour's opinion, petitioner committed the shooting on behalf of the gang.  Rangel was a documented Norteño, and Ridenour opined that the shooting was in retaliation for disrespect by a rival gang member.

*Defense Case*

The defense presented no evidence.

*Outcome*

On May 25, 2007, the jury found petitioner guilty of two counts of attempted murder, shooting at an occupied vehicle, mayhem, possession of a firearm by a felon, and street terrorism. The jury also found all special allegations true.  Petitioner waived a jury trial on the alleged prior convictions, and the trial judge found those special allegations to be true.

Trial on the August 26, 2006 Incident

*Prosecution case*

The prosecution presented evidence of the following:

On the evening of August 26, 2006, Romeo Laminero left a coworker's party in his black Honda Accord, accompanied by Karengee Pangilinan and Marissa Ruvalcaba.  When Laminero stopped at a red light, the Honda was bumped from behind by another car.  Laminero got out of the car and saw petitioner coming toward him with a gun.  Laminero got back in the Honda and

3

drove toward the freeway.  As they drove away, Laminero, Pangilinan, and Ruvalcaba heard gunshots.  The Honda was bumped again on the passenger side rear door.  The vehicle hit the center median and got stuck.

The other car, a red Dodge Neon driven by codefendant Justin Dale Canon, blocked the Honda from moving.  Petitioner got out of the Neon and approached Laminero with a gun. Petitioner put the gun to Laminero's head and demanded the car.  Laminero saw a woman get out of the Neon while Canon remained in the driver's seat.  Laminero hesitated, and petitioner put the gun to his stomach and again demanded the car.  Petitioner also pointed the gun at Pangilinan and ordered her out of the car.  Pangilinan believed she saw a gun in Canon's hand but was not sure. After Laminero got out of the car, he ran down the street.  Petitioner got into the Accord and drove away.

Stockton Police Officer John Black interviewed Laminero, Pangilinan, and Ruvalcaba at the scene.  Black broadcast a description of the suspects and vehicles.  The following day, an officer observed Canon driving the red car.  As Canon attempted to flee, he threw a TEC-9 firearm, a black backpack, and several nine millimeter bullets from the car.  Officers arrested Canon.  An investigation revealed the red car had black paint transfer and body damage.  A loaded .22-caliber pistol lay on the front passenger seat.

Officers located Laminero's Honda about a mile from where the incident occurred.  The Honda had been stripped of some parts and had red paint transfer on one side.  A detective interviewed Laminero a week and a half after the carjacking.  From a photo lineup, Laminero identified Canon as the driver of the red car and petitioner as the person who aimed a gun at him. Laminero also identified the TEC-9 firearm thrown from the red car as the weapon petitioner pointed at him during the carjacking.

Detective Ridenour testified as an expert on Hispanic gangs.  He testified that there are different subsets of the Sureños, based on geographic location.  Both petitioner and Canon had ties to the Bay Area and tattoos of the number 19.  Ridenour contacted the San Francisco Police Department and confirmed the existence of the "19th Street Mission District Sureños," a subset of the Sureños.  According to Ridenour, being in a subset of the Sureños did not diminish an

1   individual's status as a Sureño.  The Sureños' primary activities include homicides, attempted

2   homicides, carjackings, burglaries, possession of firearms, vandalism, and drug sales.  Petitioner

3   was a known gang member who had admitted to being a Sureño during a previous arrest.

4   Codefendant Canon was also a known Sureño.  Ridenour opined that the carjacking was a gang-

5   related activity, based on the fact that it was committed by two gang members in concert.  Gang

6   members frequently commit carjackings in order to obtain cars not previously linked to them for

7   use in criminal activity.  This assists the gang as a whole.  Commission of violent crime also

8   increases a gang's status.

9       *Defense Case*

10      Codefendant Canon testified that Laminero, the victim, gave him the TEC-9 and the .22-

11   caliber firearm that were in petitioner's possession when he was arrested.  Canon denied being

12   present at the carjacking, stating he was asleep at the time.  Canon admitted he and petitioner

13   belonged to the 19th Street San Francisco Sureños.  However, Canon stated he was not a Sureño

14   when outside of San Francisco.

15      Petitioner testified on his own behalf.  He admitted having belonged to the 19th Street

16   Sureños for 15 years.  He denied any involvement in the carjacking.  Petitioner disputed

17   Ridenour's assessment that all of his tattoos, particularly one that said "Mission," were gang

18   related.  Petitioner testified that the gun he threw out of the car when arrested was given to him by

19   friends.

20      *Outcome*

21      On June 29, 2007, the jury found petitioner guilty of carjacking, two counts of assault

22   with a deadly weapon, possession of a firearm by a felon, and street terrorism.  The jury also

23   found all special allegations true.  Petitioner waived a jury trial on the alleged prior convictions,

24   and the trial court found those special allegations to be true.

25      On August 6, 2007, petitioner was sentenced to an aggregate determinate term of 96 years

26   8 months and an aggregate indeterminate term of 135 years to life, for a total of 231 years 8

27   months to life.

28   ////

5

1    Post-conviction Proceedings

2    Petitioner timely appealed, and the California Court of Appeal for the Third Appellate

3    District affirmed the convictions in an unpublished opinion filed February 10, 2011.  Lodged

4    Doc. 6.  Petitioner's timely petition for review was denied by the California Supreme Court on

5    May 18, 2011.  Lodged Doc. 8.

6    Petitioner did not seek collateral review in the state courts.  The federal habeas petition

7    was filed on December 20, 2011.  It includes four issues raised and exhausted on direct appeal.

8    Respondent answered these claims on the merits, asserting no procedural defenses.  See ECF No.

9    14.

10    STANDARDS GOVERNING HABEAS RELIEF UNDER THE AEDPA

11    28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of

12    1996 ("AEDPA"), provides in relevant part as follows:

13    
> (d) An application for a writ of habeas corpus on behalf of a person
14    in custody pursuant to the judgment of a state court shall not be
> granted with respect to any claim that was adjudicated on the merits
15    in State court proceedings unless the adjudication of the claim –
16    
> (1) resulted in a decision that was contrary to, or involved an
> unreasonable application of, clearly established Federal law, as
17    determined by the Supreme Court of the United States; or
18    
> (2) resulted in a decision that was based on an unreasonable
> determination of the facts in light of the evidence presented in the
19    State court proceeding.

20    The statute applies whenever the state court has denied a federal claim on its merits,

21    whether or not the state court explained its reasons.  Harrington v. Richter, 131 S. Ct. 770, 785

22    (2011).  State court rejection of a federal claim will be presumed to have been on the merits

23    absent any indication or state-law procedural principles to the contrary.  Id. at 784-785 (citing

24    Harris v. Reed, 489 U.S. 255, 265 (1989) (presumption of a merits determination when it is

25    unclear whether a decision appearing to rest on federal grounds was decided on another basis)).

26    "The presumption may be overcome when there is reason to think some other explanation for the

27    state court's decision is more likely."  Id. at 785.

28    The phrase "clearly established Federal law" in § 2254(d)(1) refers to the "governing legal

6

1   principle or principles" previously articulated by the Supreme Court.  Lockyer v. Andrade, 538

2   U.S. 63, 71-72 (2003).  Clearly established federal law also includes "the legal principles and

3   standards flowing from precedent."  Bradley v. Duncan, 315 F.3d 1091, 1101 (9th Cir. 2002)

4   (quoting Taylor v. Withrow, 288 F.3d 846, 852 (6th Cir. 2002)).  Only Supreme Court precedent

5   may constitute "clearly established Federal law," but circuit law has persuasive value regarding

6   what law is "clearly established" and what constitutes "unreasonable application" of that law.

7   Duchaime v. Ducharme, 200 F.3d 597, 600 (9th Cir. 2000); Robinson v. Ignacio, 360 F.3d 1044,

8   1057 (9th Cir. 2004).

9        A state court decision is "contrary to" clearly established federal law if the decision

10  "contradicts the governing law set forth in [the Supreme Court's] cases."  Williams v. Taylor, 529

11  U.S. 362, 405 (2000).  A state court decision "unreasonably applies" federal law "if the state

12  court identifies the correct rule from [the Supreme Court's] cases but unreasonably applies it to

13  the facts of the particular state prisoner's case."  Id. at 407-08.  It is not enough that the state court

14  was incorrect in the view of the federal habeas court; the state court decision must be objectively

15  unreasonable.  Wiggins v. Smith, 539 U.S. 510, 520-21 (2003).

16       Review under § 2254(d) is limited to the record that was before the state court.  Cullen v.

17  Pinholster, 131 S. Ct. 1388, 1398 (2011).  The question at this stage is whether the state court

18  reasonably applied clearly established federal law to the facts before it.  Id.  In other words, the

19  focus of the § 2254(d) inquiry is "on what a state court knew and did."  Id. at 1399.  Where the

20  state court's adjudication is set forth in a reasoned opinion, §2254(d)(1) review is confined to "the

21  state court's actual reasoning" and "actual analysis."  Frantz v. Hazey, 533 F.3d 724, 738 (9th

22  Cir. 2008) (en banc).  A different rule applies where the state court rejects claims summarily,

23  without a reasoned opinion.  In Richter, supra, the Supreme Court held that when a state court

24  denies a claim on the merits but without a reasoned opinion, the federal habeas court must

25  determine what arguments or theories may have supported the state court's decision, and subject

26  those arguments or theories to § 2254(d) scrutiny.  Richter, 131 S. Ct. at 786.

27  ////

28  ////

DISCUSSION

I.      Claim One:  *Batson*

      The prosecutor exercised peremptory challenges to excuse two African-Americans from the jury at the first trial, and one African-American at the second trial.  At both trials, the defense challenged the strikes under Batson and Wheeler.[1]  On both motions, the trial judge asked the prosecutor to state her reasons for the strike, which the court then found to be racial-neutral and credible.

      A.  Factual and Procedural Background

        1.  First Trial

*Prospective Juror A.T.*

      Defense counsel questioned A.T about tattoo evidence, noting that petitioner had facial tattoos and asking if that fact alone would "make you lean against him?"  RT Aug. (Lodged Doc. 12, Vol. II) at 154.[2]  A.T. replied that it would not, since "a lot of people have tattoos."  Id. at 155.  A.T. further stated: "That doesn't mean you're a gang member.  Doesn't mean you're a bad person either.  You just . . . like tattoos.  Everybody likes something.  Some people like collecting cars, some people like collecting model cars.  That doesn't mean you're a bad person just because you got tattoos.  You can say that I may be a bad person, but you don't know me.  So I mean, you can only really listen to what's said."  Id.

      The prosecution asked A.T. about the credibility and believability of witnesses.  The prosecutor asked, "Are you willing to change your position if someone gives you reasonable information that makes sense that maybe you missed?"  A.T. answered, "Yeah."  Id. at 210.  The questioning continued:

---

[1] Batson v. Kentucky, 476 U.S. 79 (1986), and its state law counterpart, People v. Wheeler, 22 Cal. 3d 258 (1978).

[2] "R.T. Aug." refers to the Reporter's Augment on Appeal.  The transcripts relevant to the Batson motion at the first trial, involving the proceedings of May 15, 2007, are designated by the Reporter as Volume 1 of 1, and are lodged in this court as Lodged Doc. 12, Vol. II of III.  The transcripts of jury selection from the second trial, in June 2007, are designated by the Reporter as Volume 1 of 2 and Volume 2 of 2, and are lodged here as Lodged Doc. 12, Vols. I of III and III of III, respectively.

[Prosecutor]: And you indicated that you can tell if someone is lying perhaps if they make it something bigger than what it appears to be or what it was?

[A.T.]: Yeah, usually.

[Prosecutor]: What about if they mitigate, make it less than?

[A.T.]: I didn't consider that.

[Prosecutor]: Can you now?

[A.T.]: Yeah, I consider it now.

[Prosecutor]: Can you understand why someone might be fearful to come in and testify in court?

[A.T.]: Yeah, if — you know, if they're not comfortable with putting theirself [sic] in a situation like that. . . . Fearful they may see a family member later on, or something.

Id. at 210-11.

In response to the defense Batson motion, the prosecutor said that she had excused A.T. because he appeared to "agree overwhelmingly" with another juror (W.R., discussed below) who made comments about "the system" and "poor versus rich" that the prosecutor thought favored the defense.  Id. at 251-52.  She also noted a questionnaire reference to "Bloods and Creeps" that she interpreted as making light of gang violence.  Id. at 252 ("To me, that minimizes and makes light of and [a] joke of the gangs. . . . He felt it necessary to indicate that he's not a gang member, and on that same page under number two, he indicates the Bloods and Creeps comment.").  She was concerned about his comments equating gang member tattoo "collectors" with legitimate collectors of coins and cars.  Id. at 252-53.  Finally, she noted that A.T. had a brother who was a criminal defendant.  A.T. had no information about his brother's situation, and "if he had any feelings . . . his response was it wasn't me.  So it's almost like he has no global interest in what's going on around him . . . that's why I ultimately decided I didn't feel he would be a good group working person, and also understanding to all the complexities and the witnesses that are going to be in this matter, and exercised my challenge."  Id. at 253.

////

////

9

1    *Prospective Juror W.R.*

2    On voir dire, W.R. made the following statements about tattoo evidence:

3    It seems to me that . . . people have tattoos, and some tattoos are
       identifiable.  And regardless of whether the person's in a gang or
4      they're not in a gang, regardless of whether the person is rich or not
       rich, I do think that it impacts . . . the justice system when the
5      people look at it that way.  But I think that everybody — they have
       an opportunity to present themselves. [¶]  People should be honest,
6      and if they're being honest, they're going to look at . . . just the
       evidence that's there.  I mean, it doesn't make a difference — I have
7      relatives that have been in gangs, I have friends that have been in
       gangs.  I have friends in jail, I have friends that are in law
8      enforcement.  And some of them are good people, some of them are
       bad, on both sides. [¶]  But the fact of the matter is, any one
9      situation, which is what we are here for, has to be judged on the
       merits of that situation and that circumstance, not based off of their
10     history or . . . it's not a matter of we're going to get you now.

11   RT Aug. (Lodged Doc. 12, Vol. II) at 156-57.

12   Defense counsel also questioned W.R. about violent crime.  W.R. responded: "I've had a

13   gun pointed in my face.  I've been robbed at a store.  I've been attempted — somebody attempted

14   to jump me when -- most of this is when I was younger, a teenager where I lived.  I grew'd [sic]

15   up in Southern California, and it wasn't that uncommon.  And . . . it's just one of those things."

16   Id. at 176.

17   The prosecution questioned W.R. about the depiction of the criminal justice system on

18   television.  W.R. stated:  "No, I don't believe it's educational.  I believe that it gives you different

19   perspectives, different mindsets.  You see some things . . . seem blatantly accurate, and some

20   things . . . are . . . just for the story.  A lot of times they'll base stuff off of current type topical

21   events.  But it's just interesting."  Id. at 187.

22   W.R. and the prosecution also discussed the "one witness rule."  The prosecution

23   described the rule: "[I]f there is only one witness to a crime, and that person is believed -- you

24   have to believe that person -- that evidence, that testimony that person provides to you, can prove

25   a fact that you can rely on.  Does that make sense?"  W.R. stated the prosecution's description

26   made more sense than the written instruction.  W.R. later asked for more clarification of the one

27   witness rule.  Id. at 206-08.

28   In response to the Batson motion, the prosecutor said that she excused W.R. because of

10

1   his "significant rapport with defense counsel." Id. at 250.  She noted that W.R. gave

2   "exaggerated laughs" when defense counsel spoke, leaned toward defense counsel, and generally

3   appeared "very interested in the defense side of the table, and also defense counsel." Id. at 250-

4   51.  The prosecutor also expressed concern about W.R.'s understanding of the one witness rule.

5   She expressed even greater concern about how his life experiences might affect his ability to be

6   impartial:

> It appeared to me as though [W.R.] has had some personal
> experiences in his life that . . . I felt could potentially bias him
> against the process, against the system. He also had been a victim
> of what he described as a gang battery, which he did not report. [¶]
> And one of his other comments was in regards to violence
> becoming commonplace in the place that he is from, and I had
> concerns that he was not going to understand the severity and the
> seriousness of this offense, in regards to his prior living
> environment and how he had described it. [¶] And also, the fact that
> he had . . . a number of relatives that were involved in the criminal
> system. [¶] And based on all of his comments . . . which I felt gave
> him his underlying opinion of the system as a whole, that he would
> have a bias that . . . I could not trust.

14   Id. at 251.

15   *Trial Court's Ruling*

16   The trial court denied the motion, ruling as follows:

> I'll be honest. I did not pay as much attention on [A.T.] I don't know
> whether that was because he wasn't questioned as extensively as
> [W.R.] or was not as verbal as [W.R.] [W.R.] was very engaged in
> the process.  And the one thing I did notice, when you excused
> him, he was very upset when he left. That I did note. But I'll be
> honest, I really was not watching A.T. as carefully as I was [W.R.]
> [¶] And in looking at their questionnaires, I do see that there are
> some indications in here that [the prosecution] has alluded to.
> Obviously, when we use questionnaires, we have more of an
> abbreviated voir dire, so some of the things you raised are
> contained in the questionnaires, not necessarily subject of the oral
> voir dire. [¶] At this point, I'm going to find that [the prosecution]
> has a proper group-neutral explanation for her exercise of
> challenges of these two gentlemen, and that based on those
> explanations and a review of the questionnaires and what I
> observed on [W.R.] specifically, I'll find that the proper [sic]
> explanation is genuine and not a sham or pretext for group bias at
> this point.

26   Id. at 253-54.

27

28   ////

11

1        2.  Second Trial

2        *Prospective Juror D.B.*

3        D.B. was questioned in camera regarding his past felony conviction, which had been

4    overturned on appeal after he served four years in prison.  RT Aug. (Lodged Doc. 12, Vol. I) at

5    179-80.  Since that experience, D.B. had been involved in prison ministry for youth and in

6    visiting adult prisons to "carry a message of hope for people that are addicted to drugs."  Id. at

7    180.  During voir dire in open court, D.B. explained that he worked as a drug counselor for a

8    Proposition 36 diversion program.  Id. at 210, 239-41.  He explained that he didn't consider this

9    to be "working for the system," but working to "help people get their life on track."  Id. at 240.

10   His sister had been killed by a drunk driver, and D.B. was unsatisfied with the outcome of the

11   case because the driver's sentence was too low.  Id. at 210-211.  D.B. said that he would not be

12   affected as a juror by his sister's death or by his own "unfortunate incident. . . in the law."  Id. at

13   211-12.

14       D.B. was the only African-American out of 18 prospective jurors in the box when the

15   prosecutor excused him.  In support of the Batson motion, defense counsel reviewed the

16   information in D.B.'s questionnaire, noting that he was a family man, well educated, steadily

17   employed, worked as a drug counselor, served in the army, stated he could be fair and impartial,

18   and was willing to serve on a jury.  RT 4 at 906.[3]  Defense counsel acknowledged that D.B. had

19   been convicted of "some type of crime" but won his release on appeal.  Id. at 906-07.  D.B.'s

20   opinion that the system had treated his sister's killer too leniently did not support an inference of

21   anti-prosecution bias.  Id. at 908.  In short, D.B. demonstrated "absolutely no animosity toward

22   the system.  In fact, works with the system, works with judges, works with the ADAP Program.

23   Basically, a responsible citizen.  And I just don't see any rational reason to preempt this

24   individual."  Id. at 907.

25       The prosecutor addressed defense counsel's characterization of D.B.  She noted that D.B.

26   spent four years in state prison for a felony and had prior convictions for moral turpitude, theft,

27

28   _____
     [3] "RT" refers to the Reporter's Transcript on Appeal (Lodged Doc. 11).

and drug possession.  In discussing his counseling work, D.B. had specified that he did not

consider himself to work "with the system" but as a recovering addict on behalf of other

individuals with drug or alcohol problems.  RT 4 at 908-09.  She further explained the reason for

the strike as follows:

> [D.B.] kept staring at me throughout the full extent of the time that he was sitting in that seat.  And it was not something — every time I looked up at the jury he was staring at me . . . and when he observed my glance, he did not exchange, you know, a smile or an acknowledgment or anything to that effect, but he continued to stare at me while he was up in the jury box. [¶] I did not find his . . . response to my questions as comforting or comfortable as he did when he was responding to [defense counsel] in his direct questioning of him.

Id. at 910.

*The Trial Court's Ruling*

The judge stated that she had paid particular attention to the body language of prospective

jurors during voir dire, and had made notes about the questioning, because of the Batson motion

at the previous trial.  RT 4 at 911.  She made the following findings:

> . . . [S]ometimes when you have a Batson-Wheeler, you have a situation where the DA does not ask any questions or asks only perfunctory questions knowing full well we are going to kick off. [¶] I didn't see that.  I thought [the prosecutor] was not disproportionate in her questioning of [D.B.].  I don't think there was – or that she picked on him.  Either way, I don't think it was disbursed either for him or against him.
>
> The thing that really caught my eye was that when [defense counsel] was doing his voir dire, [D.B.] was sitting leaning forward with his hands in his lap. [¶] When [codefendant's counsel] was doing her voir dire, he was doing the same. [¶] When [the prosecution] was questioning, he was paying attention to her; however, when she would move to other people, he physically turned to the side, put his hand on his — his chin on his right hand, and did not look at her and physically turned his body away from her. [¶] And I was actually kind of surprised about that because I was watching very carefully during questioning.  But when she was done with him, he physically turned himself away from her and was not paying attention.  He didn't do that with either of the other attorneys. [¶]  So I think there was body language to indicate that, along with his previous felony conviction, even though that was overturned, and the answer to his questions.  So I'm going to deny the motion . . .

RT 4 at 911-12.

B.   The Clearly Established Federal Law

Purposeful discrimination on the basis of race in the exercise of peremptory challenges violates the Equal Protection Clause of the United States Constitution.  See Batson, 476 U.S. 79; Johnson v. California, 545 U.S. 162 (2005).  So-called Batson claims are evaluated pursuant to a three-step test:

> First, the defendant must make out a prima facie case 'by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.' [Citations].  Second, once the defendant has made out a prima facie case, the 'burden shifts to the State to explain adequately the racial exclusion' by offering permissible race-neutral justifications for the strikes.  [Citations.]  Third, '[i]f a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination.' [Citation.]

Johnson, 545 U.S. at 168 (footnote omitted); see also Tolbert v. Gomez, 190 F.3d 985, 987-88 (9th Cir. 1999) (en banc).

At the third step of Batson, "the trial court determines whether the opponent of the strike has carried his burden of proving purposeful discrimination."  Purkett v. Elem, 514 U.S. at 765, 768 (1995).  Although the burden remains with the defendant to show purposeful discrimination, the third step of Batson primarily involves the trier of fact.  After the prosecution puts forward a race-neutral reason, the court is required to evaluate "the persuasiveness of the justification."  Id. To accept a prosecutor's stated nonracial reasons, the court need not agree with them.  The question is not whether the stated reason represents a sound strategic judgment, but "whether counsel's race-neutral explanation for a peremptory challenge should be believed."  Hernandez v. New York, 500 U.S. 352, 365 (1991) (plurality opinion).  This credibility determination must be made in light of the totality of the relevant facts about a prosecutor's conduct.  Batson, 476 U.S. at 94; see also Hernandez, 500 U.S. at 363.

C.   The State Court's Ruling

Because the California Supreme Court denied review without comment, this court "looks through" that denial to the opinion of the California Court of Appeal.  See Ylst v. Nunnemaker, 501 U.S. 797 (1991).  As the last reasoned state court decision on the merits, the opinion on appeal is the adjudication that must be reviewed for reasonableness under 28 U.S.C. § 2254(d).

14

1     <u>Ortiz v. Yates</u>, 704 F.3d 1026, 1034 (9th Cir. 2012).

2        The appellate court ruled as follows:

3            Excusing prospective jurors based on their race violates both the

4  federal and state Constitutions. (<u>Batson</u>, supra, 476 U.S. at pp. 97-98; <u>Wheeler</u>, <u>supra</u>, 22 Cal.3d at pp. 276-277.)  <u>Batson/Wheeler</u>

5  claims are subject to a well established three-step inquiry. "First, the trial court must determine whether the defendant has made a

6  prima facie showing that the prosecutor exercised a peremptory challenge based on race.  Second, if the showing is made, the

7  burden shifts to the prosecutor to demonstrate that the challenges were exercised for a race-neutral reason. Third, the court

8  determines whether the defendant has proven purposeful discrimination. The ultimate burden of persuasion regarding racial

9  motivation rests with, and never shifts from, the opponent of the strike. [Citation.]" (<u>People v. Lenix</u> (2008) 44 Cal.4th 602, 612-

10  613, italics added (<u>Lenix</u>); <u>see also</u> <u>Johnson v. California</u> (2005) 545 U.S. 162, 168, [162 L.Ed.2d 129].)

11            Here, we are concerned with the third step of the inquiry. "At the

12  third stage of the <u>Wheeler/Batson</u> inquiry, 'the issue comes down to whether the trial court finds the prosecutor's race-neutral

13  explanations to be credible.  Credibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or

14  how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy.' (<u>Miller-El</u> [<u>v.</u>

15  <u>Cockrell</u> (2003)] 537 U.S. [322,] 339 [154 L.Ed.2d 931].) In assessing credibility, the court draws upon its contemporaneous

16  observations of the voir dire. It may also rely on the court's own experiences as a lawyer and bench officer in the community, and

17  even the common practices of the advocate and the office that employs him or her. (<u>See</u> <u>Wheeler</u>, <u>supra</u>, 22 Cal.3d at p. 281.)"

18  (<u>Lenix</u>, <u>supra</u>, 44 Cal.4th at p. 613, fn. omitted.)

19        "We review a trial court's determination regarding the sufficiency of a prosecutor's justifications for exercising peremptory challenges

20  '"with great restraint."' [Citation.] We presume that a prosecutor uses peremptory challenges in a constitutional manner and give

21  great deference to the trial court's ability to distinguish bona fide reasons from sham excuses. [Citation.]  So long as the trial court

22  makes a sincere and reasoned effort to evaluate the nondiscriminatory justifications offered, its conclusions are entitled

23  to deference on appeal. [Citation.]" (<u>People v. Burgener</u> (2003) 29 Cal.4th 833, 864 (<u>Burgener</u>).)

24        Defendant contends the trial court erred in concluding there was no

25  discriminatory intent in the prosecution's striking of A.T., W.R., and D.B. from the jury.  In particular, defendant argues the trial

26  court failed to adequately analyze the proffered explanations but instead merely repeated the prosecution's race-neutral reasons.  Our

27  review of the record belies this contention.

28        The prosecution explained that she excused W.R. based, in part, on his overly-positive demeanor toward defense counsel.  In addition,

W.R.'s personal experiences, including a number of relatives involved in the criminal justice system, could potentially bias him against the system. W.R. also stated he had relatives and friends who had been in gangs; some were good people and some were bad.

The trial court found these explanations genuine and race neutral, specifically based on its observations of W.R. in the courtroom. On this we defer to the trial court, which is in the best position to evaluate a potential juror's poise and demeanor.

As for A.T., the prosecution noted the potential juror compared having tattoos to collecting cars. In addition, the prosecution stated that in his questionnaire A.T. referred to "Bloods and Creeps," which the prosecution felt made light of the offenses facing defendant. When asked if he could impartially consider evidence, A.T. responded that he usually could tell if someone was lying by considering whether the person exaggerated the situation.

The prosecution observed that A.T. appeared to agree with W.R.'s comments. A.T. did not appear to have an understanding of the jury process or to be very open-minded about considering the evidence. The prosecution doubted A.T. could "understand[] . . . all the complexities and the witnesses that are going to be in this matter."

The trial court admitted it had not observed A.T. carefully during voir dire. However, the court did observe that A.T. appeared very upset at being excused. Based on the juror questionnaires and the prosecution's explanations, the court found the explanations were not a sham or pretext for group bias.

Contrary to defendant's assertion, the court did consider and evaluate the prosecution's explanation for A.T.'s exclusion. We agree with the trial court's assessment that the explanation was race neutral and not a pretext for group bias.

Finally, the prosecution in the second trial provided an explanation for the exclusion of D.B. The prosecution pointed out D.B. had spent four years in state prison and had prior convictions for moral turpitude. In addition, the prosecution observed D.B. kept staring at her during voir dire.

The trial court stated it had been struck by D.B.'s physical reactions to both defense counsel and the prosecution. The trial court was "watching very carefully during questioning" and observed D.B. reacted very differently to the prosecution than to defense counsel and codefense counsel. D.B.'s body language, his prior felony conviction, and his answers during voir dire convinced the trial court the prosecution's action in excusing him was not a pretext for group bias.

Again, the trial court is in the best position to assess the physical interaction between potential jurors and the prosecution. We cannot and should not substitute our judgment, based on the written

16

record, for the perceptions of the trial court. D.B.'s physical reactions and his prior felony conviction were reasonable race-neutral reasons for excusing him.

The prosecution in both trials provided permissible race-neutral explanations for excusing the three African-American jurors. The trial court here made a "sincere and reasoned" evaluation when it considered the prosecutor's response and reviewed its own recollections about the excused jury panelists. (Burgener, supra, 29 Cal.4th at p. 864.) The court's decision is supported by substantial evidence. (See Lenix, supra, 44 Cal.4th at p. 613 [trial court's Wheeler decision must be affirmed if supported by substantial evidence].)

Lodged Doc. 6 at 20-24.

The Court of Appeal went on to discuss the parties' supplemental briefs, which addressed the significance of the juror questionnaires to the Batson analysis. See Lodged Docs. 4 (Appellant's Supplemental Brief), 5 (Respondent's Supplemental Brief).[4] The Court of Appeal rejected petitioner's comparative juror analysis, finding that other jurors who gave similar answers to some questions were not otherwise comparable:

Regarding W.R.'s potential bias against the legal system, defendant argues another juror's questionnaire statement that "Judges shouldn't be harder on poor people" was very similar and that juror was not excused. However, the other juror made a general statement regarding the justice system. W.R.'s comment was much more specific, citing the disparity between penalties for crack and cocaine. . . .

Defendant contends the prosecution erred in stating more than one of W.R.'s relatives was involved in the criminal justice system. Only one relative, a cousin, was so involved. However, during voir dire, W.R. stated, "I have friends in jail." In addition, defendant points out that several jurors who had relatives with criminal records were not excused. The jurors defendant cites had relatives convicted of or arrested for various crimes, but not for murder. In contrast, W.R.'s "friend/cousin" had been charged with murder, a crime similar to that in the present case. . . .

The prosecution also cited defendant's ability to abide by the one witness rule. Defendant disputes that W.R. could not follow the rule and argues that many of the potential jurors did not understand the rule, but the prosecution only questioned W.R. about it. However, W.R. in his questionnaire stated he did not agree with the

---

[4] The questionnaires are at Lodged Doc. 10 (Clerk's Augmented Transcripts on Appeal, Vols. I – IV). Petitioner failed on appeal to have the questionnaires of A.T. and W.R. unsealed and made part of the record. This court's review under 28 U.S.C. § 2254(d) may consider only the record that was before the state court. See Pinholster, 131 S.Ct. at 1398.

one witness rule.  During voir dire, W.R. stated he could follow the law, but twice stated that one witness's testimony would not be sufficient. . . .

Lodged Doc. 6 at 28-29.

[Regarding D.B.], [d]efendant argues that other jurors had children who did not finish high school, had unconventional lifestyles, and had been convicted of crimes. While it is true other jurors had several factors similar to those relied on by the prosecution in dismissing D.B., those factors in conjunction with other factors specific to D.B. supported the trial court's finding of a race-neutral basis for excluding the juror.  D.B. believed his criminal case had not been fairly handled by the justice system. This viewpoint provided a race-neutral factor for excluding D.B.  [¶]  In addition, the prosecution expressed concern about D.B.'s involvement with drugs and his social work in prison with substance abusers.  A belief that someone involved in such social services would not be sympathetic to a case involving gangs and drugs provides a race-neutral reason for dismissal.

Lodged Doc. 6 at 32-33.

The court noted that the questionnaires of A.T., W.R. and D.B. all contained answers which corroborated the prosecutor's stated non-racial concerns and thus provided additional support for the trial judge's ruling.  Specifically, A.T. had failed to answer several questions regarding legal principles, suggesting that he did not understand them.  A.T.'s questionnaire also indicated that his brother had been convicted of a crime but that A.T. had never asked about the nature of the offense.  Id. at 30.  W.R.'s questionnaire contained several statements critical of the criminal justice system.  He reported two negative encounters with the sheriff's department, and contact with gangs and gang members in his youth.  W.R. also stated in the questionnaire that he did not agree with the one witness rule.  Id. at 28-29.  D.B.'s questionnaire reflected the belief that the criminal justice system is not fair.  He had extensive contact with gang members through his prison ministry.  Id. at 31, 33.

D.  Objective Reasonableness Under 28 U.S.C. § 2254(d)

The California Court of Appeal properly conducted step-three Batson analysis, considering all the relevant circumstances to determine whether the prosecutor's stated race-neutral reasons for the strikes were her real reasons.  See Batson, 476 U.S. at 94; see also Hernandez, 500 U.S. at 363.

18

As to prospective jurors W.R. and D.B., the trial judge found the prosecutor's observations of pro-defense or anti-prosecution inclination to be credible and to be the genuine basis for the strikes, based on the judge's own personal observation of the jurors' demeanor on voir dire.  Although the trial judge did not make similarly specific findings regarding the demeanor of A.T. during voir dire, she did explicitly find the prosecutor's race-neutral explanation for that strike to be credible.  She also noted A.T.'s demeanor in response to the strike.  The trial judge considered both the demeanor of the jurors and the conduct and demeanor of the prosecutor.  The state court of appeal deferred to those credibility findings.  Doing so was not unreasonable in light of clearly established federal law.  On the contrary, such deference was required.

As the Supreme Court has explained:

> On appeal, a trial court's ruling on the issue of discriminatory intent must be sustained unless it is clearly erroneous.  See Hernandez v. New York, 500 U.S. 352, 369, 111 S. Ct. 1859, 114 L. Ed. 2d 395 (1991) (plurality opinion); id., at 372, 111 S. Ct. 1859, 114 L. Ed. 2d 395 (O'Connor, J., joined by Scalia, J., concurring in judgment).  The trial court has a pivotal role in evaluating Batson claims.  Step three of the Batson inquiry involves an evaluation of the prosecutor's credibility, see 476 U.S., at 98, n. 21, 106 S. Ct. 1712, 90 L. Ed. 2d 69, and "the best evidence [of discriminatory intent] often will be the demeanor of the attorney who exercises the challenge," Hernandez, 500 U.S., at 365, 111 S. Ct. 1859, 114 L. Ed. 2d 395 (plurality opinion).  In addition, race-neutral reasons for peremptory challenges often invoke a juror's demeanor (e.g., nervousness, inattention), making the trial court's firsthand observations of even greater importance.  In this situation, the trial court must evaluate not only whether the prosecutor's demeanor belies a discriminatory intent, but also whether the juror's demeanor can credibly be said to have exhibited the basis for the strike attributed to the juror by the prosecutor.  We have recognized that these determinations of credibility and demeanor lie "'peculiarly within a trial judge's province,'" ibid. (quoting Wainwright v. Witt, 469 U.S. 412, 428, 105 S. Ct. 844, 83 L. Ed. 2d 841 (1985)), and we have stated that "in the absence of exceptional circumstances, we would defer to [the trial court]," 500 U.S., at 366, 111 S. Ct. 1859, 114 L. Ed. 2d 395 (plurality opinion).

Snyder v. Louisiana, 552 U.S. 472, 477 (2008).

In Snyder, the prosecutor had relied on a juror's demeanor to justify a strike, but the trial judge made no record of his own observations regarding the demeanor of the juror or that of the prosecutor.  Moreover, the trial judge made no explicit credibility determination regarding the

19

1    prosecutor's proffered race-neutral justification for the strike.  In the absence of such findings, the

2    trial court's unexplained denial of the <u>Batson</u> motion was not entitled to deference as a credibility

3    finding, and the prosecutor's stated reasons for the strike were accordingly scrutinized in light of

4    circumstances including the prosecutor's treatment of white jurors.  <u>Id.</u> at 479-486.  Because the

5    prosecutor's stated reasons were suspect in the context of jury selection as a whole, the judgment

6    was reversed and the case was remanded for further proceedings regarding intentional

7    discrimination.  <u>Id.</u> at 486.

8         The present case presents a stark contrast to the facts of <u>Snyder</u>.  The trial judge in

9    petitioner's case made a record of her personal observations both of the jurors and of the

10   prosecutor, and made the required step-three credibility findings on the record.  With respect to

11   A.T. and W.R., the judge explicitly found the prosecutor's race-neutral justifications to be

12   "genuine and not a sham or pretext for group bias."  RT Aug. at 254.  The credibility ruling as to

13   D.B. did not use the same talismanic <u>Baston</u> language, but the judge did expressly state the basis

14   for her acceptance of the prosecutor's race-neutral explanation for the strike: first, the prosecutor

15   had treated D.B. no differently than non-Back jurors in her questioning; and second, D.B. had

16   used body-language indicating an anti-prosecution attitude, just as the prosecutor stated.  RT 4 at

17   911-12.  In sum, the trial judge considered both "whether the prosecutor's demeanor belie[d] a

18   discriminatory intent, [and] also whether the juror's demeanor [could] credibly be said to have

19   exhibited the basis for the strike attributed to the juror by the prosecutor."  <u>Hernandez</u>, 500 U.S. at

20   365.  The state appellate court was required to defer to these findings on direct appeal, and that

21   decision may not be disturbed on federal habeas review.  <u>See</u> <u>Rice v. Collins</u>, 546 U.S. 333

22   (2006) (federal habeas court may not substitute its own view of the prosecutor's credibility for

23   that of the trial court as affirmed by the California Court of Appeal); <u>see also</u> <u>Felkner v. Jackson</u>,

24   131 S.Ct. 1305 (2011) (per curiam) (same).

25        The California Court of Appeal also followed clearly established federal law by

26   considering the comparative juror analysis arguments that were presented to it for the first time on

27   appeal.  <u>See</u> <u>Miller-El v. Dretke</u>, 545 U.S. 231 (2005) (applying comparative juror analysis at the

28   appellate level); <u>Boyd v. Newland</u>, 467 F.3d 1139, 1151 (2006) (failure to permit comparative

1   juror analysis on appeal constitutes an unreasonable application of <u>Batson</u> and progeny), <u>cert.</u>

2   <u>denied</u>, 550 U.S. 933 (2007).  The state court's disposition of those arguments was not

3   unreasonable.  It is unnecessary in this case to scour the juror questionnaires for information that

4   might suggest the excused jurors were treated differently from non-Black jurors with similar

5   backgrounds or characteristics.  The bottom line is that the prosecutor claimed that her strikes

6   were based largely on demeanor suggesting that each of the three African-American jurors was

7   unreceptive to her or to the prosecution.  The trial judge confirmed the accuracy of the demeanor

8   observations and found the prosecutor credible in her assertion that this was the genuine reason

9   for the strikes.  Circumstantial evidence that might otherwise be relevant to the intentional

10  discrimination inquiry is of little significance in this context.

11  II.      <u>Claim Two: Sufficiency of the Evidence To Prove Offenses Were Committed For The</u>

12          <u>Benefit Of A Street Gang</u>

13      A.  <u>Factual and Procedural Background</u>

14          Petitioner challenges the sufficiency of the evidence to support the gang enhancements

15  charged under Cal. Penal Code § 186.22(b).  Specifically, petitioner alleges in Claim Two that

16  Detective Ridenour's expert opinion testimony was inadequate to establish that either the

17  carjacking or the shooting was committed for the benefit of a gang or was otherwise gang-related

18  within the meaning of the statute.

19          Detective Ridenour testified as an expert on Hispanic gangs.  At both trials, Ridenour

20  described the Sureño gang, its territory, and its mode of operation.  According to Ridenour, one of

21  the primary activities of the gang was the commission of criminal acts such as homicides,

22  robberies, assaults with deadly weapons, burglaries, car thefts, carjackings, graffiti, possession of

23  firearms, and possession of controlled substances for sale.  Ridenour had been involved in the

24  investigations of a variety of criminal acts involving the Sureños.  When Ridenour had previously

25  arrested petitioner, he noted his gang tattoos.  Petitioner had admitted his gang membership.

26  Ridenour opined that petitioner shot at Rangel and Handy because Rangel was a rival gang-

27  member who had disrespected petitioner.  Punishing disrespect enforces the status of the gang.

28  Ridenour opined that the carjacking was gang-related because it was committed by two Sureños

1  acting together.  Carjackings benefit the gang by providing a vehicle unconnected to the gang that

2  can be used in other criminal activity.  Shooting and carjackings also benefit the gang by

3  increasing the gang's status and reputation for violence, thus increasing the gang's power on the

4  streets.

5      B.  The Clearly Established Federal Law

6      Due process requires that each essential element of a criminal offense be proven beyond a

7  reasonable doubt.  In re Winship, 397 U.S. 358, 364 (1970).  In reviewing the sufficiency of

8  evidence to support a conviction, the question is "whether, viewing the evidence in the light most

9  favorable to the prosecution, *any* rational trier of fact could have found the essential elements of

10  the crime beyond a reasonable doubt."  Jackson v. Virginia, 443 U.S. 307, 319 (1974).  If the

11  evidence supports conflicting inferences, the reviewing court must presume "that the trier of fact

12  resolved any such conflicts in favor of the prosecution," and the court must "defer to that

13  resolution."  Id. at 326; see also Juan H. v. Allen, 408 F.3d 1262, 1274, 1275 & n.13 (9th Cir.

14  2005).  In order to grant a writ of habeas corpus under AEDPA, the court must find that the

15  decision of the state court reflected an objectively unreasonable application of Jackson and

16  Winship to the facts of the case.  Juan H., 408 F.3d at 1274.  The federal habeas court determines

17  the sufficiency of the evidence in reference to the substantive elements of the criminal offense as

18  defined by state law.  Jackson, 443 U.S. at 324 n.16; Chein v. Shumsky, 373 F.3d 978, 983 (9th

19  Cir. 2004).

20      C.  The State Court's Ruling

21      This court reviews the opinion of the California Court of Appeal on direct review, which

22  was the last reasoned state court decision on this issue.  See Ortiz v. Yates, 704 F.3d 1026, 1034

23  (9th Cir. 2012).  The state appellate court ruled as follows:

24          In order to establish a gang enhancement, the prosecution must
           prove the crime was committed for the benefit of, at the direction
25          of, or in association with any criminal street gang, with the specific
           intent to promote, further, or assist in any criminal conduct by gang
26          members. (§ 186.22, subd. (b)(1).)  In addition, the prosecution
           must prove the gang: (1) is an ongoing association of three or more
27          persons with a common name, identifying sign, or symbol; (2) has
           as one of its primary activities the commission of one or more of
28          the criminal acts enumerated by the statute; and (3) includes

members who either individually or collectively have engaged in a pattern of criminal activity by committing two or more of the enumerated offenses during the statutorily defined period. (§ 186.22, subds. (e) & (f); People v. Gardeley (1996) 14 Cal.4th 605, 616-617 (Gardeley).)

These requirements may be met via expert testimony explaining gang psychology and customs. (People v. Valdez (1997) 58 Cal.App.4th 494, 507-509; Gardeley, supra, 14 Cal.4th at p. 617.) A gang expert may render an opinion in response to a hypothetical question as to gang-related activity so long as the hypothesis is rooted in the facts shown by the evidence.  (People v. Gonzalez (2005) 126 Cal.App.4th 1539, 1551, fn. 4.)

In reviewing a challenge to the sufficiency of the evidence in support of a gang enhancement, we examine the evidence to determine whether any rational trier of fact could have found the elements of the offense beyond a reasonable doubt. Substantial evidence is evidence that is reasonable, credible, and of solid value. (People v. Augborne (2002) 104 Cal.App.4th 362, 371; People v. Johnson (1980) 26 Cal.3d 557, 578.)

**September 12, 2006, Incident**

In connection with the September 2006 incident, Ridenour testified the attempted murder and related offenses were committed for the benefit of the Sureño gang because: Rangel was a Norteño; Rangel wore gang-related clothing that night, a red shirt and red hat; defendant believed Rangel bumped him as a sign of disrespect from a rival gang member; and defendant pulled a gun in front of Rangel's girlfriend.  Ridenour also related an incident in December 2006 in which defendant fought with a Norteño gang member while in a holding cell at the courthouse.

Rangel testified that, although he was once a member of the Norteños, he was no longer an active member. According to Rangel, he bumped into defendant by accident and did not think defendant belonged to a rival gang. Rangel did not notice defendant's tattoos, because he was not paying attention to him that closely.

Defendant argues Ridenour's testimony that defendant, a Sureño, would retaliate for a Norteño's disrespect "is not borne out by the evidence, as Rangel never even knew that appellant was a Sure[ñ]o." However, the question is not whether Rangel realized defendant was a rival gang member, but whether defendant recognized Rangel was a Norteño and interpreted his bump as disrespect.

Ridenour testified he had "talked to numerous gang members who have told [him] if a Norte[ñ]o and Sure[ñ]o are walking down the street and they start . . . giving dirty looks back and forth to each other, something has to be done,"otherwise"they can be punished by their own gang." According to Ridenour, there was an established rivalry between the two gangs, and gangs show

23

disrespect to one another in a variety of ways. Regardless of whether Rangel recognized defendant as a rival gang member, Ridenour provided substantial evidence that defendant shot at Rangel to further benefit the Sureños by retaliating against a perceived show of disrespect.

**August 26, 2006, Incident**

Regarding the carjacking and related offenses, Ridenour stated that in his opinion they were gang-related activities. Ridenour based his opinion on the fact that both defendant and Canon were active Sureño members who committed the carjacking together. In addition, Ridenour testified gangs commit carjackings and car thefts in order to use the pilfered vehicles to commit other crimes. Further benefit inured to the gang when the greater community became aware of the crimes and associated them with the Sureños. This notoriety enhances the gang's reputation and "facilitate[s] and assist[s] them in continued criminal gang activity.

Defendant argues Ridenour's testimony is insufficient. According to defendant: "The owner and passengers of the car, too, recognized no gang element in the carjacking offense. They never mentioned that they had been victimized by Sure[ñ]os or that any mention was made by the carjackers of their gang affiliation."

Again, the state of mind of the victim is not controlling. Regardless of whether Laminero knew his assailant was a gang member, defendant and Canon, two Sureños, took his car, a car that could be later used in further Sureño crimes. Ridenour established a link between defendant's activity and the furtherance of the goals of the gang, providing sufficient evidence for the gang enhancement.

Defendant also challenges Ridenour's testimony as improper, since it went to an ultimate issue to be decided by the jury. Defendant argues Ridenour testified that defendant possessed the specific intent to commit the crime.

We disagree. The prosecution asked Ridenour: "In your expert opinion, is the felony conduct in this case, specifically the facts that you know of . . . surrounding the . . . carjacking, gang-related activity?" Ridenour answered: "Yes."
"The requirements for expert testimony are that it relate to a subject sufficiently beyond common experience as to assist the trier of fact and be based on matter that is reasonably relied upon by an expert in forming an opinion on the subject to which his or her testimony relates. [Citations.] Such evidence is admissible even though it encompasses the ultimate issue in the case. [Citations.]" (People v. Olguin (1994) 31 Cal.App.4th 1355, 1371.) Here, Ridenour provided expert testimony on the Sureño gang culture and appropriately gave his opinion on why and whether defendant engaged in the criminal activity for which he was charged.

Lodged Doc. 6 at 34-38.

24

D.  Objective Reasonableness Under 28 U.S.C. § 2254(d)

The admissibility of Detective Ridenour's testimony and expert opinion are matters of state law that are not subject to review here.  See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991). The only question under AEDPA is whether the state court reasonably applied Jackson v. Virginia in concluding that the detective's testimony could rationally support findings that the carjacking and shooting were gang-related within the meaning of Cal. Penal Code § 186.22(b). Ridenour's testimony amply supported the necessary jury findings that the incidents of August 26 and September 12, 2006 were gang-related and intended to benefit the gang.  There is nothing objectively unreasonable about the state court's analysis in this regard.  Accordingly, habeas relief is unavailable.

III.     Claim Three: Sufficiency of the Evidence To Prove The Requisite "Primary Activities" Of The Street Gang

A.  Factual and Procedural Background

In Claim Three, petitioner challenges the sufficiency of the evidence to support an additional finding required by Cal. Penal Code § 186.22(b)(2): that the gang "has as one of its primary activities the commission of one or more of the criminal acts enumerated by the statute."

In both trials, Ridenour testified that among the primary activities of the Sureño gang was the commission of criminal acts such as homicides, robberies, assaults with deadly weapons, burglaries, car thefts, carjackings, graffiti, possession of firearms, and possession of controlled substances for sale.  Ridenour had been involved in the investigation of such crimes involving Sureño gang members.

The prosecution introduced the rap sheet of Manuel Soto, a Sureño convicted of assault with a deadly weapon and gang enhancements.  The prosecution also introduced the rap sheet of Eric Zapata, a Sureño convicted of murder.  Ridenour was personally familiar with Zapata from his days as a patrol officer with the Gang Street Enforcement Unit, and was familiar with Soto from a review of the police department's gang database.

B.  The Clearly Established Law

The federal law governing this claim is set forth above in relation to Claim Two.  In sum,

25

1    the question is "whether, viewing the evidence in the light most favorable to the prosecution, *any*

2    rational trier of fact could have found the essential elements of the crime beyond a reasonable

3    doubt." Jackson v. Virginia, supra, 443 U.S. at 319.

4        C.  The State Court's Ruling

5            This court reviews the opinion of the California Court of Appeal on direct review, which

6    was the last reasoned state court decision on this issue.  See Ortiz v. Yates, 704 F.3d 1026, 1034

7    (9th Cir. 2012).  The state appellate court ruled as follows:

8            To establish a gang enhancement under section 186.22, the
             prosecution must establish one of the group's primary activities
9            is the commission of one or more specified crimes and the group's
             members have engaged in a pattern of criminal activity.  A pattern
10           of criminal activity is defined as two or more enumerated offenses
             committed on separate occasions or by two or more persons. (§
11           186.2, subd. (e).)

12           Multiple incidents of criminal activity are not necessary to prove a
             pattern. A pattern can also be proven by showing that multiple gang
13           members participated in a single incident of criminal activity.
             (People v. Loeun (1997) 17 Cal.4th 1, 5 (Loeun).)
14
             To establish primary activities under section 186.22, the trier of fact
15           may look to both the past and present criminal activities of the
             gang.  Isolated criminal conduct will not suffice.  Sufficient proof
16           of the gang's primary activities may consist of evidence that the
             group's members consistently and repeatedly have committed
17           criminal activity listed in the gang statute.  The primary activities
             element may be established through expert testimony.  (People v.
18           Sengpadychith (2001) 26 Cal.4th 316, 323; In re Alexander L.
             (2007) 149 Cal.App.4th 605, 611 (Alexander L.).)
19
             In reviewing the sufficiency of the evidence in support of the gang
20           enhancement, we determine whether there is credible, reasonable
             evidence from which a reasonable trier of fact could find the
21           essential elements of the charge or allegation true beyond a
             reasonable doubt. (People v. Vy (2004) 122 Cal.App.4th 1209,
22           1224.)

23           Defendant argues Ridenour provided too few instances of criminal
             activity considering the size and longevity of the Sureño gang.  In
24           addition, defendant labels Ridenour's testimony "unreliable"
             because the expert was not personally involved in investigating the
25           other criminal activities.  We find no merit in either contention.

26           The prosecution can prove a pattern of criminal gang activity
             through evidence pertaining to the charged offense and one other
27           offense committed on a prior occasion by the defendant's fellow
             gang member.  (Gardeley, supra, 14 Cal.4th at p. 625; Loeun, supra,
28           17 Cal.4th at pp. 5-10.)  Here, Ridenour provided the facts of two

                                        26

prior offenses: Soto's conviction for assault with a deadly weapon on January 9, 2006, and Zapata's conviction for murder on July 17, 2006.  No further prior crimes were necessary, nor was Ridenour's personal involvement required in the criminal investigations.

Ridenour's background and expertise provided a backdrop for his testimony as to the primary activities of the Sureños.  Such was not the case in Alexander L., supra, 149 Cal.App.4th 605, relied on by defendant.  In Alexander L., the defendant was charged with vandalism stemming from his "tagging," or spreading graffiti.  (Id. at p. 609.)  An expert testified that the creation of graffiti generally benefited a gang.  The expert stated he knew the gang had "'committed quite a few assaults with a deadly weapon, several assaults. I know they've been involved in murders. [¶] I know they've been involved with auto thefts, auto/vehicle burglaries, felony graffiti, narcotic violations.'" (Id. at p. 611.)  The expert did not testify that the criminal activities comprised the gang's primary activities, nor did he provide details or any information as to how he acquired the information.  (Id. at pp. 611-612.)  The court found the expert's testimony lacked sufficient foundation.  (Id. at p. 612.)

Ridenour's testimony suffers no such infirmity.  He testified as to his background in investigating the Sureños and gave his opinion as to their primary activities, providing examples of two prior Sureño convictions for enumerated crimes.  The testimony was sufficient to establish the element of primary activities. [fn. 3]

[fn. 3:  Defendant argues Ridenour failed to differentiate between the 19th Street Mission District Sureños and the larger Sureño gang. However, Ridenour testified that there are subsets of the larger Sureño gang, and that there is no difference in being called a specific Sureño street gang name rather than being simply called a Sureño.  Even if members of different subsets called themselves different things, that did not separate them from their allegiance to the Sureño gang as a whole.]

Lodged Doc. 6 at 39-41.

D.  Objective Reasonableness Under 28 U.S.C. § 2254(d)

The state court's adjudication of this claim did not involve an unreasonable application of Jackson v. Virginia.  Detective Ridenour's testimony was sufficient to support a rational juror's conclusion that the Sureño gang, of which petitioner was an admitted member, was engaged in a pattern of criminal activity.  Under state law, the requisite pattern of activity may be established by evidence of the charged crime and *one* prior offense committed by a member of the same gang.  Petitioner's jury heard evidence of the charged crime and of *two* qualifying prior offenses committed by other Sureños.  The detective's testimony was also evidence from which a rational juror could conclude that murder and assault with a deadly weapon were among the "primary

activities" of the gang.  Ridenour's knowledge of Sureño activity derived from his first-hand investigation of such activities, including interviews with victims, witnesses, and gang members. The rap sheets of known Sureño members provided further support for the necessary factual findings.  Accordingly, the state court's adjudication may not be disturbed on habeas review.

IV.    Claim Four: Confrontation Clause

A. Factual and Procedural Background

1.   The Rap Sheets

During Detective Ridenour's testimony at both trials, Soto's and Zapata's criminal rap sheets were marked for identification and the detective testified without objection, based on the rap sheets, regarding their criminal convictions.  The rap sheets were admitted into evidence without objection at trial on the August 26 offenses. RT 3 at 706-707.  After the rap sheets were offered into evidence at the trial on the September 12 offenses, counsel objected on hearsay and constitutional grounds. RT 7 at 1965-66.  The trial court concluded the certified copies were admissible under the Evidence Code.  RT 7 at 1966.

2.   The Unavailable Witness

Petitioner contends that the trial court deprived him of his constitutional right to confront witnesses by allowing the prosecution to use Krystal Ellis's preliminary hearing testimony at trial. On appeal, petitioner argued that the trial court erred in finding the prosecution made a showing of due diligence in its efforts to locate Krystal and secure her attendance at trial.[5]

a.   The First Trial

Krystal had testified at petitioner's preliminary hearing about the interaction she observed between petitioner and David Rangel on the day of the shooting.  An evidentiary hearing regarding Krystal's unavailability as a trial witness was held on May 22, 2007, the fourth day of the trial regarding the September 2006 incident.  Jena Lane, a witness coordinator for the district attorney's office, testified that she had she had attempted to contact Krystal five times beginning on April 24, 2007.  Lane spoke with Krystal twice, on May 3, 2007, and May 16, 2007.  On May

_____

[5] Like the state court, the undersigned will refer to Krystal Ellis and Kristine Ellis, her sister, by their first names in order to avoid confusion.

3, 2007, Lane told Krystal to contact her again on May 7, 2007.  However, Krystal failed to contact Lane on the appointed day.  On May 16, 2007, Lane told Krystal to be in court the following day, and Krystal agreed to appear.  Krystal, who was under subpoena, failed to appear in court on May 17, 2007.

Lane also established contact with Krystal's sister, Kristine.  Lane spoke with Kristine several times, and Kristine agreed to help Lane locate her sister.

Between May 17, 2007, and May 22, 2007, Lane contacted local hospitals and determined Krystal had not been admitted.  Lane did not check with the Department of Motor Vehicles (DMV) or welfare records in an effort to track down Krystal.  Lane did not have access to those records.  Nor did Lane ask Kristine if Krystal had another close relative or significant other in her life.  Lane did not go to Kristine's home in search of Krystal.  On May 17, 2007, Lane contacted Kristine, who told Lane she had talked to Krystal the previous day and reminded her sister about the May 17, 2007, court date.

Detective Steven Capps testified that on May 18, 2007, he sent two officers to Kristine's home to find Krystal.  Krystal was not there.  Krystal did not have a telephone and was only sporadically in touch with her relatives.  Capps had not checked the DMV records or any other records for Krystal's address.

The prosecution informed the court that a criminal records check did not show Krystal was in custody at the San Joaquin County Jail.

After hearing the evidence, the court stated: "My only concern is I think that based on what I heard, I think there is reasonable diligence up till the 18th.  But I'm concerned, we are on the 22nd, nothing was done yesterday or today to either call the sister to see if she's heard from her or to send a patrol unit by the last known residence to see if she happens to be there."  RT 3 at 607.

The prosecution offered to have Lane again contact Kristine, noting Kristine had been very cooperative in trying to get Krystal to appear in court.  The court asked the prosecution to try again to contact Kristine and continued the hearing.

Later that day, Lane testified that she attempted to contact Krystal after the earlier hearing

but was only able to contact Kristine.  Kristine told Lane that neither she nor her father had heard from Krystal.  Kristine said she would contact authorities if Krystal contacted her.  Lane testified that Kristine told her Krystal had no other relatives in the area, and the only person she used to stay with was "locked up."  According to Kristine, Krystal lived on the streets and only came home occasionally.

Detective Capps again testified.  Following the first hearing, Capps sent a detective to Kristine's house to walk through the residence.  The detective checked every room but failed to locate Krystal.  Kristine told the detective she last saw her sister on May 16 and did not know where Krystal was currently staying.

Defense counsel argued the prosecution could have done more to locate Krystal, including reviewing DMV records or the "welfare rolls could be checked to see if there's a[n] address there."  RT 3 at 664.  The prosecution countered that everything possible had been done and argued that Krystal was in hiding to avoid testifying.

The court held as follows:

> I think that there is more that could have been done, I agree with [defense counsel], in terms of DMV, welfare records and so forth. [¶] However, you have to look at it in context. There was -- she had voluntary contact up until the 16th. Her sister and father have been cooperative. If this was a situation where it was apparent the family was being uncooperative, then I think further steps may have been necessary. [¶] But in this case, the family was cooperating. There is apparently no other known place to the family. . . . [¶] And so I think that the -- the District Attorney's Office has exercised reasonable diligence. They have followed up with contact. I think the family's been cooperative. They have gone in person and by telephone to corroborate that. So I'm going to find that the reasonable and due diligence has been found, and I will allow her testimony to be read.

RT 3 at 664.

          b.   The Second Trial

Krystal had testified at the preliminary hearing that codefendant Canon and his girlfriend, Wendy, had stayed with her and petitioner one night in late August; that Canon and petitioner had gone out in Wendy's red car that night; and that she later heard there had been a high speed chase. Krystal did not appear to testify at the second trial, involving the carjacking charges.  An

1    evidentiary hearing regarding the status of the witness was held on June 22, 2007.  Lane testified

2    that since the previous unavailability hearing she had telephoned both Krystal and Kristine.  Lane

3    spoke with Kristine on June 12, 18, 20, and 22.  Kristine was unable to provide any contact

4    information for Krystal.  Lane checked San Joaquin County Jail records, but Krystal was not in

5    the system.  Lane did not check the jail records of other counties, nor did she canvass soup

6    kitchens or other places a homeless person might go.  Lane did not have access to check general

7    relief or Social Security records.

8            Kristine told Lane that their father did not know where Krystal was.  She told Lane that

9    Krystal returned to the house just once prior to June 12, 2007.  During that visit Kristine told

10   Krystal that the district attorney was trying to contact her.  Krystal did not respond.

11           Stockton Police Officer Craig Smith testified that he contacted the "impact unit" in the

12   district attorney's investigations unit, but the only address for Krystal was Kristine's address.

13   Smith also checked criminal records between June 16, 2007, and June 22, 2007, but found no

14   record of Krystal as an inmate in San Joaquin County.  Smith did not check Sacramento or

15   Stanislaus County jails.  Smith also contacted hospitals in San Joaquin, Sacramento, and

16   Stanislaus counties.  San Joaquin County hospital had treated Krystal as an outpatient on June 4,

17   2007.  Because of patient confidentiality, Smith did not request Krystal's personal information

18   from the hospital.  Smith knew Krystal was on informal probation but had not checked whether

19   she had a specific probation officer.  The prosecution asked the court to note Krystal's warrant

20   was still outstanding.

21           The court held Krystal was unavailable and allowed the reading of her preliminary hearing

22   testimony at trial.  RT 5 at 1342.

23           B.  The Clearly Established Federal Law

24           The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall

25   enjoy the right to . . . be confronted with the witnesses against him."  The Confrontation Clause

26   prohibits the admission of testimonial out-of-court statements by non-testifying individuals.

27   Crawford v. Washington, 541 U.S. 36 (2004).  Not all hearsay implicates the core concerns of the

28   Confrontation Clause; the dispositive question is whether the statement is "testimonial."

31

1  Crawford, 541 U.S. at 51.  Although the Supreme Court declined to provide a precise definition

2  of "testimonial statements," the Ninth Circuit has noted that the examples discussed in Crawford

3  "all involve live out-of-court statements against a defendant elicited by government officer with a

4  clear eye to prosecution."  United States v. Cervantes-Flores, 421 F.3d 825, 833-34 (9th Cir.

5  2005), cert. denied, 547 U.S. 1114 (2006).

6          C.  The State Court Ruling

7          This court reviews the opinion of the California Court of Appeal on direct review, which

8  was the last reasoned state court decision on this issue.  See Ortiz v. Yates, 704 F.3d 1026, 1034

9  (9th Cir. 2012).

10              1.  The Rap Sheets

11          The state appellate court ruled as follows regarding the rap sheets:

12              In Crawford, the Supreme Court held that under the confrontation
              clause, "testimonial" hearsay cannot be admitted in a criminal trial
13              unless the defendant has the opportunity to confront and cross-
              examine witnesses with respect to the evidence. (Crawford, supra,
14              541 U.S. at p. 61.)   The court declined "to spell out a
              comprehensive definition" of testimonial hearsay (id. at p. 68), but
15              subsequent cases have provided guidance on the question.

16              In People v. Cage (2007) 40 Cal.4th 965, our Supreme Court,
              interpreting Crawford and Davis v. Washington (2006) 547 U.S.
17              813 [165 L.Ed.2d 224], concluded: "First, . . . the confrontation
              clause is concerned solely with hearsay statements that are
18              testimonial, in that they are out-of-court analogs, in purpose and
              form, of the testimony given  by witnesses at trial.  Second, though
19              a statement need not be sworn under oath to be testimonial, it must
              have occurred under circumstances that imparted, to some degree,
20              the formality and solemnity characteristic of testimony.  Third, the
              statement must have been given and taken primarily for the purpose
21              ascribed to testimony—to establish or prove some past fact for
              possible use in a criminal trial. Fourth, the primary purpose for
22              which a statement was given and taken is to be determined
              'objectively,' considering all the circumstances that might
23              reasonably bear on the intent of the participants . . . ." (Cage, supra,
              40 Cal.4th at p. 984, fn. omitted.)
24
              Two California cases make clear that rap sheets submitted to prove
25              a prior conviction or prison sentence are not testimonial in nature
              and thus do not fall within the proscriptions of Crawford.  (People
26              v. Morris (2008) 166 Cal.App.4th 363, 368-372; People v. Taulton
              (2005) 129 Cal.App.4th 1218, 1225.)  While Morris and Taulton
27              recognized that such records may ultimately be used in a criminal
              prosecution, that is not the reason for their preparation.  As noted in
28              Morris, the primary purpose of rap sheets "is to permit law

                                    32

enforcement to track necessary information regarding the arrest, conviction, and sentencing of individuals and to communicate that information to other law enforcement agencies." (Morris, at pp. 370-371.)  They are prepared for the purpose of documenting the acts and events related to the convictions, rather than to prove events relevant to a criminal trial.  (Taulton, at p. 1225.)

The trial court did not err in admitting the rap sheets of Zapata and Soto.

Lodged Doc. 6 at 42-44.

2.   The Unavailable Witness

The state appellate court ruled as follows regarding admission of Krystal Ellis's

preliminary hearing testimony:

A witness's former testimony is admissible if the witness is unavailable and the former testimony is offered against a person who was a party to the proceeding and had the opportunity to cross-examine the declarant. (Evid. Code, § 1291, subd. (a)(2).) A witness is unavailable if absent from the hearing and the proponent of the witness's statement "has exercised reasonable diligence but has been unable to procure his or her attendance by the court's process." (Evid. Code, § 240, subd. (a)(5).)

Due diligence requires "persevering application, untiring efforts in good earnest, efforts of a substantial character." (People v. Sanders (1995) 11 Cal.4th 475, 523.)  In considering whether due diligence exists, we consider the totality of the efforts used to locate a witness. (Ibid.) We consider the character of the prosecution's efforts, the timeliness of the search, the importance of the witness's testimony, whether leads were competently explored, whether the prosecution reasonably believed the witness would appear willingly and therefore did not subpoena the witness when she would have been available, and whether the witness would have been produced if reasonable diligence had been exercised.  (People v. Cromer (2001) 24 Cal.4th 889, 904 (Cromer).)

We review a trial court's determination de novo. (Cromer, supra, 24 Cal.4th at p. 901.)  We will not reverse the court's determination merely because defendant can conceive of some further step or avenue left unexplored by the prosecution.  If the record reveals sustained and substantial good faith efforts by the prosecution, defendant's suggestion of further steps not taken does not automatically render the prosecution's efforts unreasonable.  "'The law requires only reasonable efforts, not prescient perfection.' [Citation.]" (People v. Diaz (2002) 95 Cal.App.4th 695, 706.)

Regarding the first trial, defendant faults the prosecution for relying too much on Krystal's sister and for failing to check jails in surrounding counties, welfare rolls, DMV records, or places where homeless people eat or stay. Although defendant concedes the prosecution's efforts were more strenuous in the second trial, he

argues the prosecution should have searched jails outside San Joaquin County and questioned the probation department.

We find the prosecution's efforts to locate Krystal reasonable and supportive of the trial court's finding of reasonable diligence. Krystal voluntarily attended the preliminary hearing, giving the prosecution no reason to anticipate her absence from the first trial. The prosecution subpoenaed Krystal, who had spoken to Lane prior to the start of trial, again supporting the inference that she would appear at trial.

When Krystal failed to appear, Lane contacted Kristine and discovered Krystal was out of contact with her family. Kristine cooperated in Lane's efforts to find her sister. Detective Capps asked other officers to search Kristine's home, to no avail.  Kristine informed Lane that her sister was homeless and therefore difficult to contact.

The prosecution served Krystal with a subpoena.  When she failed to appear at the first trial, a body attachment was issued to secure her appearance and remained outstanding during trial.

When Krystal remained missing at the second trial, Lane again contacted Kristine, to no avail. Lane also checked jail records. Officer Smith checked out Krystal's contact address, did a criminal records check, and contacted surrounding hospitals.

Despite defendant's insistence that other avenues should have been pursued, the record reflects sustained, substantial good faith efforts by the prosecution to insure Krystal's presence at trial. The trial court did not err in admitting Krystal's preliminary hearing testimony.

Lodged Doc. 6 at 49-51.

D.  Objective Reasonableness Under 28 U.S.C. § 2254(d)

The California Court of Appeal held that the Zapata and Soto rap sheets were not "testimonial statements" within the meaning of Crawford.  That holding is not unreasonable.  The rap sheets were not "live out-of-court statements against a defendant elicited by government officer with a clear eye to prosecution."  Cervantes-Flores, 421 F.3d at 833-34 (describing attributes of testimonial statements emphasized by Crawford Court).  Crawford itself specifies that records kept in the course of business are inherently non-testimonial.  541 U.S. at 56. Accordingly, it cannot be unreasonable to hold that criminal history records are non-testimonial and therefore outside the scope of Crawford.  Indeed, many courts have so held.  See, e.g., United States v. Weiland, 420 F.3d 1062, 1077 (9th Cir. 2005) (finding documents in a "penitentiary

1    packet" including fingerprints, a photograph, and records of conviction non-testimonial);

2    Dahlberg v. Sandor, 2011 U.S. Dist. LEXIS 126244 at *64 (E.D. Cal. 2011) (finding CLETS

3    printout, which documented criminal judgment, non-testimonial).

4          The state court disposed of the challenge to Krystal Ellis's preliminary hearing testimony

5    on state law grounds that are not reviewable on federal habeas.  See Estelle v. McGuire, 502 U.S.

6    62, 67-68 (1991).  Moreover, no Crawford problem is presented on the facts here.  Crawford's

7    prohibition does not apply to the prior testimony of an unavailable witness who was previously

8    subject to cross-examination by the defendant.  Crawford, 541 U.S. at 59 ("Our cases have thus

9    remained faithful to the Framer's understanding: Testimonial statements of witnesses absent from

10   trial have been admitted only where the declarant is unavailable, and only where the defendant

11   has had a prior opportunity to cross-examine.").  Nothing in Crawford casts doubt on the

12   constitutionality of Cal. Evid. Code § 1291(a)(2), on which the state court relied.  To the contrary,

13   the state evidentiary rule is entirely consistent with Crawford and its antecedents.  See Mattox v.

14   United States, 156 U.S. 237 (1895) (prior testimony of deceased witness not inadmissible under

15   Confrontation Clause); Barber v. Page, 390 U.S. 719, 725-26 (1968) (recognizing exception to

16   the confrontation requirement for the prior testimony of an unavailable witness); California v.

17   Green, 399 U.S. 149, 165 (1970) (preliminary hearing testimony admissible because fully subject

18   to cross-examination at preliminary hearing);  Ohio v. Roberts, 448 U.S. 56, 67-70 (1980)

19   (preliminary hearing testimony of unavailable witness admissible).[6]

20         In Barber, supra, the Court held that the unavailable witness exception for prior cross-

21   examined testimony applies only where prosecutorial authorities have made a "good faith" effort

22   to secure the appearance of the witness.  390 U.S. at 722-25.  The Barber Court found no such

23   effort on the facts before it, where the prosecutor "made absolutely no effort to obtain the

24   presence of [the witness] at trial other than to ascertain that he was in a federal prison outside [the

25   jurisdiction]."  Id. at 723.  Accordingly, the Court found that the witness was not "unavailable"

26

27   ─────────────────────
     [6] In Crawford, the Court overruled Roberts regarding the "indicia of reliability" test for
     admissibility of hearsay statements, but affirmed the result in Roberts as consistent with the
28   Framer's understanding of the Confrontation Clause.  Crawford, 541 U.S. at 58.

1   and the Confrontation Clause accordingly barred admission of his prior testimony. Here, in

2   contrast, the prosecution made repeated affirmative attempts to obtain the presence of the witness.

3        No Supreme Court case after <u>Barber</u> has specified a higher standard for unavailability than

4   a good faith effort to produce the witness. In <u>Roberts</u>, <u>supra</u>, the Court found the witness

5   unavailable based on circumstances quite similar to those here: the witness had dropped out of

6   sight prior to trial; the prosecutor contacted family members, who were unaware of the witness's

7   whereabouts; and the prosecutor issued subpoenas to the witness's last known address. <u>Roberts</u>,

8   448 U.S. at 75. As here, there was more that might have been done, including contacting social

9   services. <u>Id.</u> The existence of additional steps that might have been taken, however, does not

10  defeat a finding of good faith. The <u>Roberts</u> Court accordingly concluded that the <u>Barber</u> standard

11  had been satisfied, and upheld the finding that the witness was unavailable. <u>Id.</u> at 75-76.[7]

12       The California statutory requirement of due diligence, which the state appellate court

13  found was satisfied here, exceeds the <u>Barber</u> good faith standard that defines the contours of the

14  federal constitutional issue. Even if the state court erred in its application of Cal. Evid. Code §

15  1291(a)(2), therefore, there would be no Confrontation Clause violation. Moreover, the record

16  demonstrates a good faith effort to produce Krystal Ellis within the meaning of <u>Barker</u> and

17  <u>Roberts</u>. For all these reasons, the state court did not unreasonably apply clearly established

18  federal law in rejecting petitioner's claim. Under any standard of review, the claim lacks merit.

19  CONCLUSION

20       For all the reasons explained above, the state court's denial of petitioner's claims was not

21  objectively unreasonable within the meaning of 28 U.S.C. § 2254(d). Accordingly, IT IS

22  RECOMMENDED that the petition for writ of habeas corpus be denied.

23       These findings and recommendations are submitted to the United States District Judge

24  assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within twenty-eight

25  days after being served with these findings and recommendations, any party may file written

26  objections with the court and serve a copy on all parties. Such a document should be captioned

27

28  [7] This holding is independent of the "indicial of reliability" analysis that was overruled by <u>Crawford</u>, and therefore survives.

36

"Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within fourteen days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Courts order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

DATED: April 25, 2014

ALLISON CLAIRE
UNITED STATES MAGISTRATE JUDGE